**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JAMES McHUGH CONSTRUCTION CO., an Illinois Corporation,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Case No.: 18-cv-6301** |
| | ) | |
| **GREAT AMERICAN INSURANCE COMPANY, an Ohio corporation,** | ) | |
| | ) | |
| *Defendant.* | ) | |

**COMPLAINT FOR BREACH OF CONTRACT**

NOW COMES the Plaintiff, JAMES MCHUGH CONSTRUCTION CO., by and through its attorneys, FRANCO MORONEY BUENIK, LLC and for its Complaint for Breach of Contract against Great American Insurance Company, states as follows:

**The Parties**

1.    James McHugh Construction Co. is an Illinois Corporation with its principal place of business located at 1737 South Michigan Avenue in the City of Chicago, Illinois.

2.    McHugh is engaged in the business of construction, and is the general contractor for a building being constructed at 1200 South Indiana Ave. in the City of Chicago, Illinois (hereinafter, the "Project").

3.    Great American Insurance Company (hereinafter either "Great American" or the "Surety") is an insurance company licensed by the State of Illinois to write insurance, and to write surety bonds including construction payment and performance bonds.

4.    Great American is organized under the laws of Ohio, and has its principal place of business at 301 East Fourth Street, Cincinnati, Ohio.

**Jurisdiction and Venue**

5.      Subject matter jurisdiction is proper pursuant to 28 U.S.C. section 1332 as Plaintiff is a citizen of the State of Illinois, Defendant is a Citizen of the State of Ohio and the amount in controversy is in excess of $75,000.

6.      Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. section 1391 because a substantial part of the acts or omissions giving rise to this claim occurred in Chicago, Illinois.

**The Project**

7.      McHugh was and is a general contractor on a construction project located at 1200 S. Indiana Ave. in the City of Chicago, Cook County and the State of Illinois (the "Project").  The project involved the construction of a three-phase residential development which is to be over 80 stories tall.

8.      As part of its work, McHugh subcontracted part of the work on the Project to Chicago Heights Glass, Inc. ("CHG"), an Illinois corporation.  A copy of said subcontract ("the Subcontract") is attached hereto as Exhibit "A".

9.      The CHG subcontract called for CHG to fabricate and install a tower façade system, in part on a design-build basis.

**The Subcontract**

10.      The scope of work CHG was hired to perform and complete is described in Exhibit A to the Subcontract and the Specifications:

- "[A]ll Tower Façade Work in accordance with the Contract Documents."  The term "Contract Documents" is defined to include the Subcontract, the plans and specifications, all addenda issued by the Owner, and all change orders and construction change directives.  (Exhibit A, page 1; Subcontract term 1.1);

2

- Provide a 6500 tower façade system and curtain wall system (Ex A, Scope Items 1-2);

- CHG "will modify the design of the exterior wall system as required to meet performance requirements." (*Id.*);

- CHG shall meet all performance requirements set forth in the Contract Documents. (Exhibit A, Scope Item 1; see also Scope Item 83);

- CHG shall include lab testing, field testing, and performance mock up testing as specified in the Contract Documents. (Exhibit A, Scope Items 20; 27);

- CHG "guarantees that the work will, when complete, produce and constitute a complete operable leak proof and effective curtain and window wall system." (Exhibit A, Scope Item 57);

- CHG will comply with the Project Schedule, which "indicates the start of the installation of the glass units on floors 3 through 17 on October 17, 2017. Subcontractor shall expedite the visual mock-up and performance mock-up to ensure the installation starts on October 17, 2017. . ." (Exhibit A, Scope Item 58);

- "Exterior wall assemblies to meet all provisions for movement of structure as indicated in the Contract Documents, ASTM Concrete Standards, and compliance with Structural drawings for anticipated movement of building structure. Whichever is more stringent shall govern." (Exhibit A, Scope Item 79);

- "[D]esign exterior wall assemblies to accommodate dead and live load deflection, thermal expansion, elastic shortening, and sway/torsion of the building per the Contract Documents. . ." (Exhibit A, Scope Item 80);

- "Subcontractor has examined the Contract Documents and the system design will coordinate with the other structural elements that it ties into. Specifically, design requirements and tolerances specified for column shortening, live load deflection, wind loading, concrete placement and seismic constraints have been reviewed and found to be compatible with the proposed curtainwall/window wall systems." (Exhibit A, Scope Item 98); and,

- "[M]ock-up testing shall be successfully completed prior to starting production of materials to be installed on the project. (Exhibit B, Specifications Section 01 83 16-10)

11. The Subcontract contains the following, additional obligations:

- **The Prime Contract:** "Subcontractor is bound to McHugh by the Contract Documents and shall assume towards McHugh, with respect to Subcontractor's

3

performance, the obligations and responsibilities that McHugh assumes towards Owner in the Prime Contract.  (Section 1.4)

- **Timely Performance of the Subcontract Work:**  "In the event Subcontractor fails to perform the Subcontract Work in accordance with the Project Schedule, Subcontractor shall work all necessary overtime, multiple shifts, or weekends and take all other measures required to recover any lost time and to meet the Project Schedule ("collectively, Accelerate") at no additional cost to McHugh or Owner. . . Moreover, in the event Subcontractor fails to perform the Subcontract Work in accordance with the Project Schedule and Subcontractor is unable to or fails to Accelerate sufficiently to recover any lost time, McHugh may in its reasonable discretion Accelerate other trades or subcontractors to recover such time and Subcontractor shall be responsible for such cost of Acceleration plus ten percent (10%)."  (Section 4.2)

- **Changes:** "McHugh may, by written direction, make changes and additions to the Subcontract Work ('Changes') to be performed by Subcontractor within the scope of the Prime Contractor as required by Owner.  Once McHugh directs Subcontractor to perform Changes, the Changes shall become [p]art of the Subcontract Work. . .Subcontractor agrees to perform Changes ordered in writing by McHugh."  (Section 8.1)

- **Changes:** "With respect to Changes that can be attributed to Owner or for which Owner is responsible, Subcontractor shall only be entitled to be paid for Changes in the actual amount allowed therefore by Owner."  (Section 8.3)

- **Changes:** "To the extent McHugh and Subcontractor do not agree whether work involves Changes or the proper cost of a Change, such a dispute shall be resolved pursuant to Section 11 below.  Subcontractor agrees to continue to timely perform its Subcontract Work under this Subcontract Agreement even if it contests the amount of compensation to be paid for Changes ordered by McHugh or Owner." (Section 8.10)

- **Claims:** "It is Subcontractor's burden to present any Claim (whether for time or money) it may have to McHugh, and it shall not be assumed that McHugh has knowledge of any such Claim absent notice as provided in this Section. Subcontractor MUST PROVIDE WRITTEN NOTICE AS PROVIDED BY THIS SECTION within fourteen (14) days of the day that Subcontractor knew or should have known of such a Claim, time being of the essence.  Claims must be made by written initial notice ('Initial Notice of Claim') in a document provided to McHugh's senior project manager for the Project that clearly identifies Subcontractor's purpose of making a Claim and that is separate from any schedule updates, progress reports, meeting minutes or other interim, status type communications.  For additional clarity, to properly provide McHugh an Initial Notice of Claim, Subcontractor must provide McHugh with a letter or email clearly stating that Subcontractor is making a Claim and the reason for the Claim.  The

4

Initial Notice of Claim shall provide an estimate of the amount of the Claim (in time and/or money). Within fourteen (14) days of the date by which Subcontractor knows or reasonably could have known the amount of its Claim, in dollars and/or time, Subcontractor shall provide a "Detailed Notice of Claim." A Detailed Notice of Claim shall include the precise amount (in time and/or money) Subcontractor is seeking as part of its Claim and include sufficient backup documentation and explanation to allow McHugh to analyze the Claim. TO THE EXTENT SUBCONTRACTOR IS PROVIDING A DETAILED NOTICE OF A CLAIM IN AN AMOUNT GREATER THAN $250,000, in addition to notifying the Senior Project Manager, Subcontractor SHALL ALSO PROVIDE NOTICE TO ONE OF: (a) McHugh's Senior Vice-President Overseeing the Project; (b) McHugh's General Counsel or (c) McHugh's President at the address listed on the first page of this Subcontract Agreement or via electronic mail. Conforming to this Section 11.2 is an express condition precedent to Subcontractor's ability to recover for any Claim, and SUBCONTRACTOR EXPRESSLY WAIVES ANY CLAIM NOT MADE IN ACCORDANCE WITH THE LIMITATIONS AS ESTABLISHED BY THIS SECTION 11.2. The Parties agree that even if this Section 11.2 is waived on one or more occasions during the Project, such a waiver shall not create a course of conduct and shall in no way limit the enforceability of this provision as to any other Claims. It is Subcontractor's obligation to understand and comply with any Claim provisions included in the Prime Contract. Subcontractor expressly acknowledges that TO THE EXTENT THE PRIME CONTRACT OR OTHER CONTRACT DOCUMENTS CONTAIN LANGUAGE RELATING TO THE TIMING OR FORM OF ANY CLAIM, SUBCONTRACTOR MUST COMPLY WITH THE PRIME CONTRACT AND ALLOW McHugh AT LEAST FIVE (5) BUSINESS days to evaluate the Claim and to submit a Claim to the Owner." (Section 11.2)

- **Indemnification:** "To the fullest extent permitted by law, the Subcontractor waives any right of contribution against and shall indemnify, defend with reasonable counsel of McHugh's choice, and hold harmless McHugh, the Additional Insureds (as defined in the Prime Contract), such parties as are designated on Exhibit C and their respective lenders, owners, members, directors, officers, managers, constituent partners, consultants, contractors, representatives, agents and employees, successors and assigns (each, individually, an "Indemnitee" and, collectively, the "Indemnitees") from and against all claims, damages, losses and expenses, including, but not limited to, attorney's fees and other litigation costs, arising out of or resulting from the Subcontract Work or Subcontractor's actions or inactions. Such obligation shall not be construed to negate, abridge or otherwise reduce any other right or obligation of indemnity which would otherwise exist as to any party or person described in this clause." (Section 12.1)

- **Design Build Work:** "In accordance with the times set forth in the Project Schedule or if not expressly set forth in the Project Schedule, Subcontractor shall submit to McHugh all interim design submissions and revisions for the Subcontract Work as required by the Contract Documents. . ." (Section 15.6)

5

- **Design Build Work:** "In accordance with the Contract Documents and with the times set forth in the Project Schedule, Subcontractor shall submit to McHugh Construction Documents setting forth in detail drawings and specifications describing the requirements for the construction of the Work, and showing the relationship of the Work to the overall Project. . .Subcontractor shall perform agreed upon revisions and submit revised Construction Documents to McHugh for McHugh's and Owner's approval. Subcontractor acknowledges that the design process may require significant back and forth discussions and iterative design." (Section 15.7)

- **Design Build Work:** "Subcontractor shall make any revisions to the Construction Documents necessary to secure permits, approvals, and licenses, including those which have been denied for failure of the Construction Documents to meet Legal Requirements." (Section 15.12)

- **Liquidated Damages:** Per the Prime Contract, liquidated damages are in the range of $40,000-$65,000 per day.

12.     CHG was obligated to provide a tower façade system in accordance with the Contract Documents and the Project Schedule.

13.     In the event CHG fell behind schedule, McHugh may take all measures required to make up lost time, including, without limitation, resequencing work and accelerating other trades, all at CHG's own cost. As part of this, CHG shall be responsible for liquidated damages to the extent incurred by McHugh as a result of CHG's failure to adhere to the Project Schedule.

## CHG's Performance

14.     The Subcontract between CHG and McHugh clearly specifies that CHG is required to provide a 6500 SSG window wall system. The Prime Contract likewise includes the 6500 SSG window wall system. It is the system that was bought by the Owner and by McHugh.

15.     Despite the contract requirement, on its own accord CHG indicated a new system—the 7000 RW—rather than the 6500 SSG in violation of the Contract Documents.

16.     Despite that at the time of the submission, the 7000 RW system was untested, CHG presented it to McHugh as an "equal." This switch to the 7000 RW system was not directed by

6

McHugh or the Owner. Instead, CHG's motivation in submitting the 7000 RW system was financial, as the 7000 RW system is less costly than the 6500 system. CHG made the unilateral decision to pursue and provide a different system than any of the parties discussed or agreed, and deviated from the Contract Documents, when CHG entered into their contracts. As set forth in more detail below, it has become clear that the 7000 RW system is not "equal" to the 6500 SSG, but is instead a far inferior system.

17. Designing a system that is appropriate given building movements and column shortening is the clear responsibility of CHG. The structural drawing S0.04 requires the exterior wall contractor to take into consideration column shortening and live load deflection. Specification Section 01 83 16 (Exterior Enclosure Performance Requirements) indicates that the system must be designed to accommodate building movement and elastic shortening of the building. (*see also* Section 08 44 15 (Glazed Aluminum Systems) likewise referencing column shortening). Moreover, as noted above, per Specification section 01 83 16 paragraph 1.3.D ("Provisions for Movement of the Structure"), it is CHG's responsibility to "obtain all necessary projected [sic] data and make such provision in the work as may be necessary." Finally, Exhibit A to the CHG Subcontract specifically states that the exterior wall system will be designed to accommodate dead and live load deflection, thermal expansion, elastic shortening, and sway/torsion and column shortening. As the subcontractor responsible for this system, the obligation to obtain and comply with these parameters clearly fell on CHG.

18. Despite the Subcontract requirements, CHG did not address the column shortening until March of 2017 causing additional delay.

19. On March 24, 2017, CHG sent a letter to McHugh stating, "CHG is in agreement that the system must accommodate the building movements and values as outlined in the contract

documents. In moving forward, Chicago Heights Glass will proceed with the redesign of the main extrusion components to allow for .75" total movement for all aspects of the system. These movement capabilities will immediately be designed and incorporated into the system from hereon."

20. On March 28, 2017, CHG Submitted "Submittal #08 44 15-21.0: PMU final record shop drawings" which includes the +/- ¾" vertical deflection tolerance in response to RFI-239. These were deficiencies which caused substantial delay in the Project.

21. In order for CHG to begin installation of its work, it must first pass a successful performance mock up test ("PMU"). The specifications and Subcontract are clear that passing the PMU is a prerequisite to both the production of materials and installation: "Mock-up testing shall be successfully completed prior to starting production of materials to be installed on the project. Production of extrusions, or fabrications of same into job-specific parts, prior to completion of mock-up testing, shall be at the risk of the Contractor." (Exhibit B, Specifications Section 01 83 16-9).

22. CHG failed three PMU tests. In May of 2017, CHG indicated that the PMU would be completely fabricated by the end of June. In late August, CHG began PMU testing of the 7000, which failed.

23. Although its submittals setting forth revised test procedures were rejected, CHG nonetheless made the determination to proceed with testing utilizing its unapproved procedures on September 21 and 22, 2017. CHG's further PMU of the 7000 RW failed as well.

24. On November 2, 2017, CHG tested the 7000 RW for a third time using the approved testing procedures dated October 26, 2017. Again, CHG's failed to pass the test.

25.     On November 9, 2017, CHG submitted yet another revised set of PMU testing procedures. These procedures were rejected because test procedure number 12 utilizes movement values that are lower than what the design team has specified that the building will experience.

26.     Despite that CHG has failed to pass a PMU in accordance with an accepted test procedure, CHG had already procured and fabricated approximately 8 floors of windows for the Project. This is in conflict with the specifications, which clearly state that mock up testing shall be successfully completed *before* starting production of materials to be installed on the Project, and that any production of extrusions or fabrication is at CHG's own risk. The non-conforming CHG work method resulted in substantial delays to the Project.

27.     Given CHG's repeated, failed attempts to pass a PMU—as well as its refusal to test to a set of standards and procedures called for by the Contract Documents – and not the procedures that CHG unilaterally selected -- McHugh became increasingly concerned with the viability of the 7000 RW system. The 7000 RW system was cheaper, was an inferior product and as designed by CHG, is prone to water resistance failure due to the head receptor design, especially when the system is in the "full open position."

28.     Accordingly, on November 14, 2017, McHugh notified CHG that 7000 RW system was rejected based on the three failed test results and the inability of CHG to address the numerous defects in the system. CHG was directed to immediately take all steps to begin procuring, testing and fabricating the 6500 SSG system as called for in the Contract Documents.

29.     CHG was never able to provide windows which met the performance criteria for the Project of the Contract Documents.

30.     During the course of the Project, CHG breached the Subcontract and was in substantial and material default in one or more of the following ways:

a. failed to construct a sufficient barrier system which met the Contract Documents and which could pass a mock up test in compliance with the Project's requirements;

b. failed to provide a 6500 tower façade system and curtain wall system in compliance with the contract documents and agreed schedule;

c. failed to design the exterior wall system as required to meet the performance requirements;

d. failed to meet the performance requirements set forth in the Contract Documents which were incorporated into the Subcontract;

e. failed to comply with and meet the Project schedule;

f. failed to design and deliver exterior wall assemblies to accommodate dead and live load deflection, thermal expansion, elastic shortening and sway/torsion of the building per the contract documents which were incorporated into the Subcontract;

g. failed to pass a mockup test prior to production and fabrication of the windows;

h. failed to accelerate its work to make-up for its delays;

i. failed to fulfill its design build responsibilities as detailed in Section 15 of the Subcontract;

j. failed to meet the Project requirements;

k. was over three months late in delivering windows;

l. was never able to develop and deliver a system which was able to accommodate the movement associated with an 80 story building; and

m. was otherwise in substantial and material breach of the Subcontract.

31. CHG was given numerous notices of the above defaults and opportunities to correct the above defaults, but has failed to do so, resulting in substantial delay and additional costs to McHugh.

32. McHugh has performed all of its obligations set forth in the Subcontract.

33. As a result of the above defaults, it became clear to McHugh that CHG was unable to perform its work under the Subcontract in accordance with the Contract Documents and provide

a system in a workmanlike manner which would be able to prevent water infiltration through the exterior of the building.  As such, McHugh issued a default notice to CHG.

34.     GAIC was notified of the default by CHG, and accepted the default.

**The Bonds**

35.     The Surety issued a payment bond and a performance bond for the Project on behalf of its bond principal, Chicago Height Glass, Inc. naming McHugh as the Obligee.

36.     The Performance Bond, no. CA1539406 is attached hereto as Exhibit "C," is in the penal sum of $24,484,000 and provides in pertinent part:

> NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, that if the above bounded Principal shall well and truly perform all of the undertakings, covenants, terms, conditions and agreements of said Subcontract within the time provided therein, and any extensions thereof that may be granted by the Obligee, and during the life of any guaranty required under said Subcontract, and shall also well and truly perform all the undertakings, covenants, terms, conditions, and agreements of any and all duly authorized modifications of said Subcontract that may hereafter be made, and shall indemnify and save harmless said Obligee of and from any and all loss, damage, and expense, including costs and attorneys fees, which the said Obligee may sustain by reason of failure so to do, then this obligation shall be null and void; otherwise it shall remain in full force and effect.
>
> Whenever Principal shall be declared by the Obligee to be in default under the Subcontract, the Principal's Surety shall, within ten (10) days after notice of default from the Obligee, notify the Obligee of its election either to promptly proceed to remedy the default or promptly proceed to complete the Subcontract in accordance with and subject to its terms and conditions. In the event the Principal's surety does not elect to exercise either of the above-stated options, then the Obligee thereupon shall have the remaining work completed, Principal's Surety to remain liable hereunder for all expenses, including attorney's fees, of completion.

37.     In addition to the Foregoing, Great American also issued a payment bond for the Project, Bond no. CA1539406, in the penal sum of $24,484,000.  McHugh is an Obligee on the Payment Bond, which provides in pertinent part:

> NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, that if the Principal shall promptly make payment to all persons supplying labor and material in the prosecution of the work provided for in said Subcontract and any and all modifications of

said Subcontract that may hereafter be made, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

*\*\**

The said Principal and the said Surety agree that this Bond shall inure to the benefit of all persons supplying labor and material in the prosecution of the work provided for in said Subcontract, as well as to the Obligee, and that such persons may maintain independent actions upon this Bond in their own names.

38.     McHugh has declared the bond Principal to be in default, which default the Surety has accepted and agreed.

39.     Upon the declaration by the Obligee that the Principal is in default, it is the Surety's obligation under the Performance Bond to notify the Obligee within ten days after notice of default of its election either to promptly proceed to remedy the default or promptly proceed to complete the Subcontract in accordance with and subject to its terms and conditions.

40.     The Surety has never provided the Obligee with its election of remedy waiving any claim by the Surety to direct or determine the remedy, leaving the Obligee with the sole option and discretion of determining the remedy to be provided by the Surety at the Surety's cost.

41.     As a consequence of the default by the bond Principal, McHugh has spent large sums of money for self-performed labor and for material all of which is compensable from the Surety under the performance bond and the payment bond.

**Great American Insurance Company's Conduct**

42.     McHugh timely defaulted CHG when it was necessary to do so, which the Surety has admitted, and has since kept the Surety advised of the status of the Project.

43.     The Surety has engaged consultants, has examined and reviewed the project documents, and has performed multiple site reviews.

44.     The Surety's investigation revealed that the default of CHG was timely, necessary and appropriate.

45.     The Surety's investigation has shown that the fix undertaken by McHugh is reasonable and appropriate.

46.     Based upon the extensive investigation done by the Surety, the Surety including its representatives, have told McHugh the following:

        a.      The McHugh was correct to have defaulted CHG;

        b.      The Surety appreciates McHugh defaulting CHG when it did.  Otherwise, the financial impact of CHG's poor performance would have been much greater to the Surety;

        c.      The Surety appreciates McHugh working to finish CHG's work, rather than seeking the Surety to do so on its own;

        d.      The Surety appreciates the efforts McHugh has made, both in terms of providing the project documents and providing access to the Project; and,

        e.      That the Surety approves and accepts McHugh's work method, both in terms of completing CHG's scope of work and McHugh's efforts to mitigate the effect of CHG's impacts to the work.

47.     As it was required to do under its Bonds, the Surety made a partial payment of $3,241,470.80 to McHugh, to address the delays and impacts caused by CHG.

48.     After the partial payment by the Surety, McHugh sought additional funds to address the self-performed work of McHugh, the claims by the other subcontractors who were impacted by CHG, and the claims by the Architect for the additional work it had to perform as a result of CHG's poor performance totaling in excess of $2 million.

49.     The Surety made multiple promises to McHugh and its representatives that these additional monies would be paid to remedy the impacts caused by CHG and to avoid a liquidated damages claim by the Owner.

50.     With regard to payment to the Project subcontractors, these payments were necessary because of the extra work and expense incurred or to be incurred by those subcontractors to recapture the schedule and properly perform their work, after being significantly impacted by CHG.

51.     Over a period of months, the Surety made multiple promises and agreed to make additional payments to the Architect, McHugh and the Subcontractors to remedy the impacts of CHG – all of which promises were relied upon by McHugh.

52.     On September 6, 2018, the Surety, suddenly and without warning, breached its agreement to compensate McHugh, the Architect and the subcontractors by refusing to pay any further monies for the delays and impacts caused by its bond Principal.

53.     The effect of the Surety's promises and its breach is that McHugh must now fund these expenses on its own, that the expense has increased because of the Surety's delay, and McHugh now faces the possibility of liquidated damages arising from the Surety's delay – all caused by the Surety's breach of its promises to provide funding for the impacts caused by GHC and by the associated delay.

54.     That by the Surety's admissions and by making a partial payment under the bond, the Surety has waived all bond defenses, and is estopped to deny that there was a valid and *bona fide* default of CHG, making the Surety fully obligated under its Bonds, which claims currently exceed $7 million.

55.     That the Surety's conduct and delay in paying under its Bonds are vexatious, unreasonable, malicious and oppressive.

56.     The Bonds stand as a contract between Great American and McHugh, for the benefit of McHugh.

14

57.     McHugh satisfied all conditions precedent under the Bond, and was not and is not in breach thereof.

58.     Under the Bond, Great American has the obligation to indemnify McHugh with regard to the costs and fees incurred by or imposed upon it in connection with remedying any and all defaults of its bond principal, CHG including costs, interests and attorney's fees. This right of action for attorney's fees, costs and interest is a direct claim against the payment and performance bonds.

59.     CHG failed to perform the work required of it under the Subcontract to satisfactory standards giving rise to a separate claim to attorney's fees, cost and interest against CHG, which is the responsibility of Great American under the payment and performance bonds.

60.     McHugh has demanded that Great American continue indemnify it in respect of costs and fees it has incurred and/or which other parties to the Subcontract have incurred as a result of the defaults of its bond principal, which Great American has refused to do.

61.     Great American is in material breach of the Bonds.

WHEREFORE, the Plaintiff, James McHugh Construction Co. prays this honorable Court to enter and award in its favor for the full impacts cause by the poor performance of CHG and the breach of the Surety's obligations under its bond, together with the following relief:

a.      A finding that CHG was in default of its Subcontract with McHugh;

b.      A finding that the Surety had the obligation to fund the impacts caused by CHG's poor performance and it default, and to fund all of the impacts caused by CHG;

c.      A finding that the Surety is in breach of its promise to pay the expense for McHugh self-performed work, claims by the Owner against McHugh for the additional costs of the architect and for the additional costs of the subcontractors;

d.      A finding that the Surety is in breach of its obligations under the Bonds;

e.      That by way of the Surety's bad faith, its breach of the bonds, and by its vexatious, unreasonable, malicious and oppressive conduct, the Surety is barred, has waived or in the alternative is estopped to raise or rely upon any surety defenses, including the bond limit/penal sum under the Bonds; and,

f.      To award McHugh all of its attorney's fees, interest and its litigation costs and expense.

**McHugh Demands Trial By Jury**

Dated: September 14, 2018         Respectfully submitted,

**JAMES McHUGH CONSTRUCTION CO.**

By:    */s/ Robert J. Franco*
         One of Its Attorneys

Robert J. Franco
Andrew C. Patton
Scott O. Reed
Stephen R. Ayres
FRANCO MORONEY BUENIK, LLC
500 W. Madison St., Suite 2440
Chicago, Illinois 60661
312/466-1000